IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.: 23-CR-1020 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | DEFENDANT'S MOTION FOR |
| MATTHEW DAVID KEIRANS, | ) | DOWNWARD DEPARTURE AND |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |

## TABLE OF CONTENTS

I.    WITNESSES..................................................................................................3

II    EXHIBITS ...................................................................................................3

III.   ISSUES .......................................................................................................4

    A.  The Loss Amount Is Zero; Alternatively, Should The Court Determine There Is An Intended Loss, The Court Should Depart Downward Pursuant To Subsection (C) To § 2B1.1, comment. (n.21). ................................................................................5

    B.  The Court Should Not Apply A Two-level Enhancement For The Offense Resulting In Substantial Financial Hardship Pursuant To Section 2B1.1(b)(2)...............................11

    C.  The Court Should Not Apply A Two-level Enhancement Pursuant To Section 2B1.1(b)(11)................................................................................................14

    D.  The Court Should Not Apply A Two-level Enhancement Pursuant To Section 2B1.1(b)(16)(A) ........................................................................................16

    E.  The Court Should Not Find That The Cost Of W.W.'s Hospitalization Constitutes Loss Within The Meaning Of Section 2B1.1 .......................................................23

    F.  The Court Should Not Apply A Two-level Enhancement Pursuant To Section 3A1.1(b)(1) ...............................................................................................25

    G.  The Court Should Apply An Enhancement Under Section 3A1.3 ...............................27

1

H.  The Court Should Not Impose A Fine and Should Sustain The Defendant's Objection To The Three Related Special Conditions of Supervision.............................................31

I.  The Defendant Objects To The Proposed Special Condition Requiring Participation In A Mental Health Evaluation .................................................................................33

J.  The Court Should Only Award $6,190 In Restitution ..................................................33

K.  The Costs Of Court Appointed Counsel .....................................................................33

L.  The Court Should Not Depart Upward Under Sections 2B1.1, comment. (n.21); 3A1.3, comment. (n.3); 5K2.3 (Extreme Psychological Injury); § 5K2.4 (Abduction or Unlawful Restraint); or § 5K2.8 (Extreme Conduct)..............................................34

    i.  Section 2B1.1, comment. (n.21) ............................................................34

    ii.  Section 3A1.3, comment. (n.3) .............................................................36

    iii.  Section 5K2.3 (Extreme Psychological Injury) ...........................................37

    iv.  Section 5K2.4 (Abduction or Unlawful Restraint) ......................................37

    v.  Section 5K2.8.......................................................................................38

M.  The Court Should Depart Downward Pursuant To Section 5K2.23; Alternatively, The Court Should Include The Time The Defendant Served In Bremer County Jail In Its Judgment ......................................................................................................38

N.  The Court Should Vary Downward ...........................................................................39

IV. Conclusion ......................................................................................................................39

Matthew David Keirans, through counsel, hereby submits the following motion for downward departure sentencing memorandum.

I. Witnesses

Defendant does not anticipate calling any witnesses at the sentencing hearing.

II. Exhibits

Defendant anticipates submitting the following exhibits at the sentencing hearing:

A. Video posted to YouTube titled "You Won't Believe This!" by "Fousey".

B. Video posted to YouTube titled "You Just Did Act PRANK!" by "Fousey".

C. Video posted to YouTube titled "I FOUND Homeless BILL!" by "Fousey".

D. Video posted to YouTube titled "He's Gone…" by "Fousey".

E. Video posted to YouTube titled "Bad News!" by "Fousey".

F. People of the State of California v. Matthew Kierans, No. BA480543, excerpts from transcript of proceedings held on October 16-17, 2019.

G. U.S. Bank Statement dated July 25, 20219 through September 25, 2019, for M.J.W., minor.

H. Email from Allison Foster, LA Assistant Head Deputy, dated September 4, 2023.

I. People of the State of California v. Matthew Kierans, No. BA480543, excerpts from transcript of proceedings held on November 19, 2019.

J. People of the State of California v. Matthew Kierans, No. BA480543, excerpts from transcript of proceedings held on December 10, 2019.

K. People of the State of California v. Matthew Kierans, No. BA480543, excerpts from transcript of proceedings held on December 19, 2019.

L. People of the State of California v. Matthew Kierans, No. BA480543, excerpts from transcript of proceedings held on January 24, 2020.

M. People of the State of California v. Matthew Kierans, No. BA480543, excerpts from transcript of proceedings held on February 10, 2020.

N. Email from Nancy Zimmer regarding financial information.

O. Emails from Christopher Nathan to Wisconsin Department of Justice.

P. Bank of America Subpoena Response dated January 10, 2024.

Q. Instagram Screenshot of "William Woods – woodsw677" profile

R. Time and Expense Report from Federal Defender's Office for Defendant's case.

S. Bremer County Sheriff's Office – Booking Cover Sheet dated July 3, 2024.

T. Receipt for restitution payment made.

U. Affidavit of Nancy Zimmer

V. Letter from Matthias Woods

W. Letter from Nancy Zimmer

X. Letter from Glenn Londre, CPA

Y. Letter from Felicia White

### III. Issues

The Final Presentence Investigative Report (PSR) identified the following issues that require the Court's resolution: 1) the amount of loss and resulting enhancement, USSG §2B1.1(b)(1); 2) whether to apply a two-level enhancement for the offense resulting in substantial financial hardship, §2B1.1(b)(2); 3) whether to apply a two-level enhancement for the offense involving the use of a means of identification unlawfully to obtain another means of identification, or the possession of five or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, §2B1.1(b)(11); 4) whether to apply a two-level enhancement for the offense involving the conscious or reckless risk of serious bodily injury, §2B1.1(b)(16)(A); 5) whether to apply a two-level enhancement for the defendant knowing the victim of the offense was a vulnerable victim, §3A1.1(b)(1); 6) whether to a apply a two-level enhancement for a victim being physically restrained in the course of the offense, §3A1.3; 7)

4

whether to impose a fine, and if imposed, the three special conditions of supervision requiring the defendant to pay said criminal monetary penalty; 8) whether to impose the special condition of supervision requiring the defendant to participate in a mental health evaluation, and if recommended, mental health treatment; 9) the amount of restitution; 10) the Defendant's ability to pay the costs of court-appointed counsel; 11) whether to depart upward, USSG §2B1.1, comment. (n.21); USSG §3A1.3, comment. (n.3); USSG §5K2.3 (Extreme Psychological Injury); USSG §5K2.4 (Abduction or Unlawful Restraint); and/or USSG §5K2.8 (Extreme Conduct); and 12) whether to depart downward, subsection (C) to §2B1.1, comment. (n.21).   Docket No. 37.

In addition, the Court will need to determine whether to depart downward pursuant to §5K2.23 and whether to vary downward pursuant to 18 U.S.C. § 3553(a).

A. The Loss Amount Is Zero; Alternatively, Should The Court Determine There Is An Intended Loss, The Court Should Depart Downward Pursuant To Subsection (C) To §2B1.1, comment. (n.21).

Loss amount in a case involving a False Statement to a National Credit Union Administration Insured Institution, in violation of 18 U.S.C. § 1014, is calculated under §2B1.1. See USSG App. A.   Section 2B1.1 is entitled:

"Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving

Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery;

Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit

Bearer Obligations of the United States."

These words are important because they inform the Court regarding the purpose of this Section. By extension, they instruct the Court regarding what kind of conduct results in a loss.   The first word used is "larceny." Larceny is defined as "The unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it *permanently*."   *Black's Law*

*Dictionary* 885 (7th ed. 1999) (emphasis added). This definition requires a criminal *mens rea*; to wit, a specific intent to *permanently* deprive someone (or something) of their property. Larceny does not include conduct which involves the specific (non-criminal) intent to return (or payback) property.

The second word used is "Embezzlement." Embezzlement is defined as "The fraudulent taking of personal property with which one has been entrusted, esp. as a fiduciary". The criminal intent for embezzlement – unlike larceny and false pretenses – arises after taking possession (not before or during the taking). *Id*. at 540. It follows that embezzlement does not include conduct where the person took possession of the property contemporaneous with the intent to return (or payback) the property.

The next phrase is "other forms of theft." Theft is defined as "1. The felonious taking and removing of another's personal property with the intent of depriving the true owner of it; larceny. 2. Broadly, any act or instance of stealing, including larceny, burglary, embezzlement, and false pretenses." *Id*. at 1486-1487. Plainly, theft does not include instances of taking property where there is no criminal purpose to dispossess the owner of their property. Neither is there a theft where the taker intends, at and beyond the outset of the taking, to lawfully return the property to its owner.

The following phrase is "Offenses Involving Stolen Property; Property Damage or Destruction." Stolen property is defined as "Goods acquired by larceny, robbery, or theft." *Id*. at 1432. As such, if there is no larceny or theft (as demonstrated above) there is no stolen property.

The next phrase is offense involving "fraud and deceit." Fraud is defined as "1. A knowing misrepresentation of the truth or concealment of a *material* fact to induce another to act to

his or her detriment." *Id*. at 670 (emphasis added). Fraud must therefore involve misrepresentation of a material fact. There is no fraud without a material misrepresentation. And as is pertinent here, materiality is not an element of Section 1014. *United States v. Wells*, 519 U.S. 482 (1997). Further, the word "and" is a conjunctive, meaning that the words "fraud and deceit[1]" guide the Court's loss amount determination. *See Bruesewitz v. Wyeth L.L.C.*, 562 U.S. 223, 236 (2011) (holding that when terms are connected by a conjunctive, courts typically interpret the phrase to require satisfaction of both of the conjunctive terms).

The penultimate word is "Forgery." Forgery is defined as "The act of fraudulently making a false document or altering a real one to be used as if genuine." *Black's*, at 661. There is no forgery without the fraudulent making or altering of a document.

The final phrase is "Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." Admittedly, examples of counterfeit instruments include cashier's checks, money orders, and forms of identification.[2] While the inclusion of this phrase explains why the Defendant's offense conduct might fall under §2B1.1, it does not otherwise help the Court determine loss amount under §2B1.1.

The Defendant respectfully requests that the Court keep the above definitions in mind when determining whether there was any loss (actual or intended) when the Defendant knowingly made a false statement to a Credit Union; specifically, that he was W.W. See Docket Nos. 14 and 27, at 9(L)-(N).

The Defendant's offense conduct involved his use of W.W.'s information to open multiple accounts, including a Community Credit Union Visa Platinum credit card, at Dupaco Community

---

[1] Deceit is defined as "1. The act of intentionally giving a false impression." *Black's*, at 413.
[2] https://www.occ.treas.gov/topics/supervision-and-examination/bank-operations/financial-crime/counterfeit-or-stolen-instruments/index-counterfeit-or-stolen-instruments.html

Credit Union. PSR ¶ 24. Nothing in the record (or discovery) reflects that the Defendant intended to commit any kind of "theft" with the accounts or credit card.

The offense conduct also involved the Defendant's use of W.W.'s information to obtain vehicle and personal loans from Dupaco Community Credit Union and Veridian Credit Union. PSR ¶ 25. But, the record demonstrates that the Defendant never intended to default or otherwise "steal" the loan money. Id. Indeed, the Defendant always intended to, and in fact did, pay back every cent to the Credit Unions. Id.

The Defendant's intent to pay back the loans from the moment he received them is demonstrated by not just the fact that he actually paid back the loans. It is also common sense that the Defendant had every incentive to pay back the loans. Practically, if the Defendant defaulted on the loans he risked an inquiry from the Credit Unions that might have revealed his true identity.

The Government's prosecution under Section 1014 further entrenches that there was no loss. That is, because the Defendant's "fraud" was not material and he merely used someone else's information to get the loans, it was always his intent to pay back the loans to the Credit Unions and it was never his intent to defraud the Credit Unions of their money. Again, the Defendant risked the Credit Unions discovering his true identity if he did not make good on his loan obligations. Consistent with the Defendant's decades-long efforts to hide his true identity he never intended any outcome other than repayment of the loans in full.

The Defendant respectfully submits that "loss" is intended to capture larceny, embezzlement, and other forms of theft which ultimately require that the defendant steal something and that the defendant act with a criminal purpose to take something without any intention of lawfully returning it. *See United States v. Yu Xue*, 42 F.4th 355 (3d. Cir. 2022) (explaining, in the context of trade secrets, that to calculate loss amount the district court must find

8

that the defendant's purpose was to inflict a pecuniary harm onto the victim). Because the Defendant never intended to engage in larceny, embezzlement, or any other form of theft there was no intent to inflict any loss on the credit unions.

Relatedly, the Guidelines themselves note that the purpose of estimating "loss" is to assess "the seriousness of the offense and the defendant's relative culpability." §2B1.1 comment. (background); see id. App. C Supp., at 104-05 (Amend. 793) (noting "the Commission's belief that intended loss is an important factor" because it focuses "specifically on the defendant's culpability"). Here, because the Defendant always intended to pay back the loans, finding any loss overstates not just the seriousness of the Section 1014 offense, but also the Defendant's culpability in its commission (i.e., the Defendant is the least culpable kind of offender because he always intended to pay back his loans).

There is no actual loss here because the Credit Unions were repaid in full. See §2B1.1(b)(1)(C)(i). And, there was no intended loss because the Defendant always intended to pay back the Credit Unions in full. See §2B1.1(b)(1)(C)(ii). There is no loss of any kind because the loans were never *materially* stolen from the credit unions through larceny, embezzlement, theft, or any other kind of offense that triggers application of Section 2B1.1(b)(1). In short, while the Defendant's offense involved "deceit" through the use of someone else's information, that conduct did not produce any loss within the meaning of §2B1.1.

Pragmatically, the Defendant earned the loans based on living his life under the alias of W.W. See PSR ¶ 20 (reflecting that the Defendant earned more than $700,000 from UIHC between the years 2013 and 2023). And, as will be shown below, because of the W.W.'s long-time status as an unhoused person, the Defendant did not benefit in any way from either W.W.'s credit history or any other part of W.W.'s financial background. The Defendant received

9

those loans through his own hard work.

Citing to Subsection (D)(i) to USSG §2B1.1, comment. (n.3), United States Probations writes that the loss amount is the total amount of the loans minus credits against the loans. The problem with this calculation method is straight-forward. Instead of determining "loss" amount by starting with a "loss" amount and subtracting credits, Probation starts with the "loan" amount and then subtracts "credits" against the "loan" under Note 3(D)(i). Probation's error is that rather than determine whether there even is a "loss" in the first instance, Probation simply presumes that there was a loss. Its premise is flawed. As shown above, there neither was an actual loss, nor an intended loss. Because there is no loss, Note 3(D)(i) is inapplicable. The Court should respectfully disagree with Probation's position because there is no loss to offset.

For all of the above reasons, the Court should sustain the Defendant's objection to paragraph 62 of the PSR.

Alternatively, should the Court determine that the Defendant's conduct involved a loss, the Defendant respectfully suggests that the Court should vary downward by however many offense levels by which it enhances the Defendant's offense level under §2B1.1(b)(1). The Guidelines provide that a downward departure may be warranted in cases in which the offense level substantially overstates the seriousness of the offense. See §2B1.1, comment. (n. 21(C)).

While there may be more aggravating aspects to the offense, any enhancement for loss amount substantially overstates the seriousness of the loss amount.

This case might be unique (in fact, it is its distinctive qualities that make it a poor fit for §2B1.1(b)(1)), and so it is difficult to precisely anticipate how the Court might calculate loss amount if it overrules the Defendant's objection, but, however the Court arrives at any loss, that amount does not reflect the fact that the Defendant paid back every dollar to the Credit Unions. It

is difficult to posit a more favorable posture for application of Note 21(C) than one where the Defendant reimbursed the "victim" in full before his arrest and prosecution. Pointedly, the credit unions are no worse off for the Defendant borrowing money from them. In fact, the credit unions are almost certainly better for it, otherwise they would not have extended the loans to the Defendant in the first place. After all, credit unions do not lend money out of any interest save their own.

B. The Court Should Not Apply A Two-level Enhancement For The Offense Resulting In Substantial Financial Hardship Pursuant To Section 2B1.1(b)(2).

The Government contends that Probation erred in not applying a two-level enhancement pursuant to §2B1.1(b)(2) because the Defendant's offense caused W.W. a substantial financial hardship. PSR at ¶ 62, Objection No. 10. As Probation responded, Note 4(f) to § 2B1.1 directs that, in determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (Title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit.

Beginning with the first factor (whether the offense resulted in the victim becoming insolvent), the Court should first determine W.W.'s solvency. Social media (in 2015, a Youtuber named Fousey found W.W. living on the streets and tried his best to help W.W. get a job and a home) reflects that W.W. has been insolvent since at least 2015. Exhibit A at 20:10 (reflecting that it's 2015). More precisely, it appears that W.W. has been unhoused and insolvent since 2011. Exhibit B at 2:20 and 23:15 and 28:25 (commenting that as of the posting of the video, W.W. had

been unhoused for four years); Exhibit B, at 29:40 (showing W.W. stating that he was homeless no later than 2011). At the time of the video posting to social media, W.W. had $6 and change to his name. Id. at 53:45.

Sadly, it appears that approximately one year after W.W. squandered[3] Fousey's[4] generosity that W.W. was abusing alcohol and once again living on the streets. Exhibit C, at 2:31 (showing W.W. living on the streets in possession of a bottle of alcohol). But, however unfortunate W.W.'s unhoused status may be, it shows that W.W.'s insolvency is entirely of his own devise (the Defense recognizes that W.W.'s insolvency appears related to his obvious and significant mental health issues[5]). The Defendant's offense did not cause, produce or result in W.W.'s insolvency.

Turning to the second factor, and as Probation wrote, it does not appear that the Defendant's conduct caused W.W. to file for bankruptcy.

Respecting the third factor, and again as Probation noted, it does not appear that the Defendant's conduct caused W.W. to suffer the loss of a retirement, education, or other savings or investment fund.

Regarding the fourth factor, Probation correctly responded that the record does not reflect that the Defendant's conduct caused W.W. to make substantial changes to his employment, such as postponing his retirement plans. Here, the facts are that, as of 2015, W.W. had not applied for a job in a long time. Exhibit A, at 23:10 (W.W. stating that the last time he applied for a job was "a

---

[3] See Exhibit D at 4:55 (showing that Fousey tried for more than 10 hours to find W.W. to continue helping him).

[4] https://en.wikipedia.org/wiki/FouseyTube   Fousey paid for three nights at a hotel for W.W. Exhibit A, at 29:20. See also Exhibit B, at 16:30 (showing Fousey bought W.W. a nice pair of shoes;  Exhibit B, at 53:45 (showing Fousey giving W.W. $150); Exhibit E, at 7:20 and 17:05 (showing W.W. lying to Fousey about getting an identification card).

[5] W.W. reported that he has never accepted medication to manage his patent mental health issues. Exhibit B, at 38:10.

while ago, quite a while ago."). Per Footnote Four, W.W. (perhaps due to his mental health issues) had little interest in working, even with help from and through the assistance of others.

As far as the fifth factor (whether the Defendant's conduct caused W.W. to make substantial changes to his living arrangement, such as moving to a less expensive home) goes, it is an interesting question whether "three hots and a cot" with medical and dental care[6] is less desirable than living on the streets when you don't know from where you will get your next meal. Opinions of institutional actors aside, portions of the unhoused population have expressed that they prefer jail to homelessness.[7] Regardless of the answer to this difficult question, the record does not support that the Defendant's conduct caused W.W. to make *substantial* changes to his living situation.

Arriving at the final factor, whether the Defendant's conduct caused W.W. to suffer substantial harm to W.W.'s ability to obtain credit, this factor weighs heavily against application of §2B1.1(b)(2). First, the Defendant denied that he ever used W.W.'s credit or that he ever intended for W.W. to pay off his debt. While Probation responded that the Defense stipulated to this fact in the plea agreement. This is incorrect.

The plea agreement merely states that W.W. "told" the assistant branch manager that the Defendant was using W.W.'s credit and that W.W. would have to pay off the Defendant's debt. While it is true that W.W. uttered those words, it is neither true that the Defendant used W.W.'s credit, nor is it true that the Defendant ever intended for W.W. to pay off his debts (again that would only have served to out the Defendant as an impostor posing as W.W.). The under-signed

---

[6] See Exhibit B, at 39:15 and 43:30 (showing W.W. reporting that he had not seen a doctor in over a year, and had not seen a dentist in over three years despite the fact that he had lost many of his teeth); see Exhibit E, at 10:15 (showing the number of teeth that W.W. has lost over the years of his homelessness).
[7] https://www.theguardian.com/society/2022/nov/02/unhoused-people-shelters-homelessness-to-jail-cycle

13

can say that he is the King of Iowa, but while I may say that, saying it does not make it so.   More

to the point, and as shown above, W.W. was unemployed and homeless.   He did not have any

"credit."   Indeed, any credit that "W.W." had stemmed from the Defendant's employment under

W.W.'s name.   PSR ¶ 105.

Lastly, even if the Defendant's theft of W.W.'s identity negatively impacted W.W.'s

credit, it is doubtful that the harm was *substantial*.   This is because it is likely that W.W.'s credit

was "poor" to begin with.

The Court should overrule the Government's objection pursuant to §2B1.1(b)(2).

C. The Court Should Not Apply A Two-level Enhancement Pursuant To Section
    2B1.1(b)(11)

The Government objected to the PSR's decision to not apply an enhancement pursuant to

§2B1.1(b)(11) "because defendant used a means of identification unlawfully to obtain another

means of identification, and defendant possessed at least five means of identification produced and

obtained from another means of identification."   Docket No. 32, at 3.   In other words, the

Government appears to argue that the enhancement applies if the offense involved the use of a

means of identification to obtain any other mean of identification *or* if the offense involved the

possession of 5 or more means of identification that unlawfully were produced from, or obtained

by the use of, another means of identification.   See §2B1.1(b)(11)(C)(i) and (ii).

The Defense cites *United States v. Jenkins-Watts*, 574 F.3d 950 (8th Cir. 2009), where the

Eighth Circuit found that a two-level enhancement under (then) §2B11(b)(10) (now)

§2B1.1(b)(11) may apply to a defendant convicted of § 1028A.   *Id*. at 962.   There, the Eighth

Circuit found that a defendant may still receive this enhancement where he engages in *production*

within the meaning of (now) §2B1.1(b)(11) because "the production of a counterfeit access device

or authentication feature is not conduct encompassed by the prohibition on double counting in the

14

commentary to § 2B1.6[8]. See U.S.S.G. § 2B1.1(b)(10)(B)." *Id.*

The Defendant respectfully argues that *Jenkins-Watts* supports overruling the Government's objection.

Regarding the first prong and whether "the offense involved the use of a means of identification to obtain any other mean of identification," the word "obtain" is different from the word "produce." First, the words mean different things. Second, and more importantly, the Commission's decision to use the phrases "produced from" or "obtained by" within this very subsection demonstrates that words "obtain" and "produce" mean different things within the context of §2B1.1(b)(11)(C)(i). Per *Jenkins-Watts* and Note 2 to §2B1.6, because the Defendant did not use a means of identification to *produce* another means of identification, the Government's objection that the Defendant should receive an enhancement under §2B1.1(b)(11)(C)(i) because the Defendant "used a means of identification unlawfully to *obtain* another means of identification" should be overruled. At bottom, the word "obtain" is more synonymous with the phrase "transfer, possession, or use" than the word "produce." See §2B1.6, comment. (n.2).

Respecting the second prong and whether the offense involved "at least five means of identification produced and obtained from another means of identification," the Defendant did not produce at least five means of identification from another means of identification. As discussed above, when terms are connected by a conjunctive, courts typically interpret the phrase to require satisfaction of both of the conjunctive terms. *See Bruesewitz*, at 236. It follows that application of §2B1.1(b)(11) requires a defendant to obtain *and* produce at least five means of identification from another means of identification. Here, the Defendant did not produce any means of

---

[8] Note Two reads, in part, "If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the *transfer, possession, or use* of a means of identification when determining the sentence for the underlying offense." §2B1.6, comment. (n.2) (emphasis added).

identification, he merely obtained them. This is insufficient to trigger application of §2B1.1(b)(11).

Lastly, that a third party may have produced the means of identification for the Defendant does not constitute production for purposes of applying §2B1.1(b)(11). This is because that interpretation would render the word "obtained" in §2B1.1(b)(11)(C)(ii) superfluous (which courts may not do) as the defendant will always have "obtained" the means of identification from a third-party. *See Westerfeld v. Indep. Processing, L.L.C.*, <u>621 F.3d 819, 824</u> (8th Cir. 2010).

For all of the above reasons, the Defendant respectfully requests that the Court overrule the Government's objection under §2B1.1(b)(11).

### D. The Court Should Not Apply A Two-level Enhancement Pursuant To Section 2B1.1(b)(16)(A)

The Defendant's offense did not involve the conscious and reckless risk of serious bodily injury.

In light of the forthcoming arguments, now is as good a time as any to discuss causation within the meaning of the Guidelines. The Guidelines require that a defendant's sentence "be based on 'all harm that resulted from the acts or omissions' of the defendant." §1B1.3(a)(3)). The term "resulted from" establishes a causation requirement which includes both cause-in-fact (but-for causation) and proximate cause. *See United States v. Peppel*, <u>707 F.3d 627, 644</u> (6th Cir. 2013) (explaining that under the Guidelines, "[c]ausation includes two distinct principles, cause in fact, or what is commonly known as 'but for' causation, and legal causation." (quoting *United States v. Rothwell*, <u>387 F.3d 579, 583</u> (6th Cir. 2004)); see *United States v. Ryan*, <u>9 F.3d 660</u> (8th Cir. 1993) (citing to *Black's Law* to define proximate causation as "That which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred. . . . An injury or damage is proximately cause by an act,

or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage; and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.").

Applying this principle, courts have vacated sentences when the government failed to produce sufficient evidence to show proximate or but-for causation. *See United States v. Berger*, 587 F.3d 1038, at 1046-47 (9th Cir. 2009).

With these principles in mind, the Defense turns to the facts of this case.

On August 20, 2019, W.W. learned the Defendant had been using his identity. PSR ¶ 26. It seems reasonable to suggest that the victim of a crime should report the crime to law enforcement. W.W. did not do this.

Admittedly, it also seems reasonable to suggest that if someone is the victim of identity theft that they might go to the financial institution to alert the institution that the offender was utilizing it to further their theft of the victim's identity. And, if this was all that W.W. did the Defense might have more sympathy for W.W. But, this is not all that W.W. did.

Instead of contacting law enforcement or merely alerting the institution to the Defendant's offense, W.W. tried to steal the Defendant's money. See Exhibit F, at p. 2 (showing bank employee's testimony that W.W. tried to steal the money in the Defendant's account). W.W. did not try to steal a small amount. The PSR does reflect that W.W. tried to steal "large amounts" from the Defendant's accounts. PSR ¶ 27. To be precise though, W.W. tried to steal approximately $13,813.88 from the Defendant. See Exhibit G. The amount that W.W. tried to steal qualifies as "grand theft" in California, an offense punishable by a felony and up to three years in prison. CA Penal Code § 487.

W.W. may have (ironically) been charged identity theft and false impersonation, but he could just as easily have been charged with grand theft for trying to steal the Defendant's money. W.W.is a wrongdoer whose own conduct should mitigate any sympathy felt for him. W.W. may have been wrongfully convicted of the above charges, but he would have been properly convicted of grand theft.

To ensure that the Court appreciates what W.W. did here, the Court should ponder how W.W. came to walk into the very bank where the Defendant held checking accounts. After all, none of the Defendant's loans were through U.S. Bank. See PSR ¶ 25. So, how did W.W. come to walk into a U.S. Bank branch? Did he just luckily stumble into a bank that had accounts held by the Defendant? Or did he systematically walk into bank after bank until he found one with an account under his name? The latter seems much more likely. Moreover, because of the greater likelihood of the latter, W.W.'s thievery is much more aggravating and by extension any sympathy for him should be mitigated.

In the words of an Assistant Head Deputy for the Los Angeles District Attorney's Office (who clearly calls it not just how she sees it but also how it is) "I reviewed our case and the information you[9] sent. As far as our conviction goes, I do not believe there is an issue with our conviction since the defendant did enter a bank and attempt to take money from an account that was not his." Exhibit H.

The Assistant Head Deputy makes a good point.

The Defendant's offense conduct was not a cause to either W.W.'s attempt to steal his money or California's prosecution for conduct that amounted to grant theft. Nor was the Defendant's conduct an independently sufficient cause for W.W. to either try to steal his money or

---

[9] "You" refers to law enforcement in Iowa.

to California's prosecution of W.W. for what was grand theft.

In short, much of the harm to W.W. "resulted from" his own conduct.

Perhaps §2B1.1(b)(16)(A) would apply if W.W. had gone to the police to report the identity theft and then the actions of the Defendant caused W.W.'s to risk death or serious bodily injury. But, that is not what happened here.

Here, it was W.W.'s offense that risked his own death or serious bodily injury (assuming there was any risk). So, to the extent that W.W. was exposed to the risk of death or serious bodily injury from his incarceration pending trial, any risk was caused by his own wrongdoing.

The Defense also denies that pretrial detention risked death or serious bodily injury to W.W. as there is no reason to believe that the Los Angeles County Sheriff's Department could not adequately protect W.W. during his pretrial detention.

To the extent that the Government argues that W.W. risked (assuming the Defendant's offense caused the risk) death or serious bodily injury from W.W.'s pretrial detention during the COVID-19 pandemic, the Defense acknowledges that persons housed within jails were at greater risk from COVID-19 than persons who were in the free world. But, to iterate, it was W.W.'s offense that caused him to be incarcerated.

To the extent the Government argues that W.W. risked serious bodily injury from his hospitalization and restoration to competency through the administration of psychotropic medication, this issue requires more discussion. See PSR ¶ 31. First, W.W. would have been evaluated for competency and found incompetent independent of any possible claims to be the "real W.W."

Concerns regarding W.W.'s mental health and "competency" go back to at least 2015. See Exhibit B, at 25:45 (showing W.W. incoherently explaining how different corporations took

his gold). W.W. expressed numerous delusions during his talks with Fousey in 2015. See Exhibit B, at 28:40 (showing W.W. claiming that the TV show "A Current Affair" did a feature about him because he was the fastest "weinie man in the West"). Another delusion held by W.W. was that he became homeless after getting scammed out of six figures from unknown[10] individuals in 2011. Exhibit B, at 29:40. W.W. also claimed that he possessed numerous Rolex watches before becoming homeless. Exhibit B, at 30:15. W.W. then deluded that people followed him from San Diego to Los Angeles. Exhibit B, at 35:40.

As referenced above, this is when one of the interviewers asked W.W. if he was on mental health medication. Id. at 38:15.

In a different interview with Fousey, W.W. claimed that two of the 9/11 terrorists confronted him in 1995. Exhibit E, at 5:50. W.W. then claimed that the two terrorists told W.W. that they were going to be famous like W.W. (apparently the two terrorists were fans of "A Current Affair."). Id. Then W.W. said that the two terrorists told him that they were going to commit 9/11. Id. W.W. also reported that the two terrorists were United States Marines. Id. thru 7:25. Toward the end of the interview, W.W. deluded that he tried to warn the United States Government about 9/11. Id., at 14:30.

It is indisputable that circa 2015 that W.W. possessed and exhibited delusions that would have caused any defense attorney to request a competency evaluation.

To close the loop, W.W. possessed and expressed many delusions during court proceedings as well. That is why he was evaluated for competency, not because no one believed him that he was the "real W.W."

On October 16, 2019, W.W. interrupted court proceedings with the non-sequiturs "Florida. Florida." Exhibit F, at p. 3. On November 19, 2019, W.W. told the Court that he "had a little

---

10 W.W. reported that he did know how the supposed thieves found him in 2011. Exhibit B, at 33:10.

problem in San Diego years ago."   Exhibit I, at p. 2.   If W.W. was referencing the thieves who stole tens of thousands of dollars from him and then following him from San Diego to Los Angeles in open court, it stands to reason that he was expressing more delusions to his defense counsel in private.

On December 10, 2019, less than two weeks before his defense attorney requested a competency evaluation, W.W. told the Court the following:

> I HAVE TO TELL YOU. I MADE A
>
> REPORT TO FBI IN 1995, AND I MADE A REPORT ON MY UNCLE,
>
> HE'S CORRUPT. MR. MOORE WAS DOWN THERE.
>
> THE WORLD TRADE CENTER, I AM NOT TAKING DOWN
>
> THE WORLD TRADE CENTER. MY FAMILY GOT MURDERED, HIS
>
> WIFE AND KIDS, AND THE DOJ TOLD ME, KEEP MY PASSPORT
>
> TO MYSELF, I WAS TOLD, I WAS SUPPOSED TO GET DOJ NEW
>
> MEXICO TO BE PRESENT --

Exhibit J, at p. 2.

On December 19, 2019, a mere four days before the competency evaluation was ordered, W.W. told the Court: "I PROVIDED DOCUMENTATION THAT THE FBI IN MEXICO IN 1995 AGAINST MATT CORONAS…" and "BETSY ROSS IS A US CITIZEN. THAT'S ALL COPS."   Exhibit K, at p. 2.

Respectfully, there is no defense attorney in the country who would not have their client evaluated for competency after hearing the above in open court.   Nor is there a judge in the country who would not find a bona fide doubt regarding W.W.'s competency and order an evaluation.

21

On January 24, 2020, the Court found W.W. incompetent.   Exhibit L, at 2.   For his part, W.W. agreed that he was "not competent."   Less the court have had any doubts regarding W.W.'s competency based on his genuine mental health issues, W.W. then offered "MAY IT PLEASE THE COURT, IN 2014, A GUY WITH A GUN PULLED A GUN ON ME, 10.2 OUNCES OF GOLD."   Id.

W.W. was in jail because he tried to steal the Defendant's money.   W.W. was evaluated for competency, found incompetent, hospitalized for restoration proceedings, and administered psychotropic medication because of his legitimate mental health issues.   Any risk from anything related to his competency is not a function of the Defendant's offense conduct.   That is, any risk to W.W. was caused by his own conduct and mental health issues.

The Defense also denies that W.W. was at any risk of death or serious bodily injury while hospitalized in a restoration facility.   More specifically, it is a good thing that W.W. got the psychotropic medication of which he is clearly in need.

Lastly, the Defense denies that the Defendant "consciously" or "recklessly" disregarded any risk of *serious bodily injury* to W.W.   Initially, the Defense agrees with Probation that it is unclear how the Defendant's conduct risked (assuming that it was the Defendant's conduct that caused the risk) W.W. suffering "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."   See §1B1.1, comment. (n.1) (defining serious bodily injury).   It is also unclear how Defendant, a layperson living in Wisconsin, would have consciously or recklessly risked W.W.'s safety vis-à-vis W.W.'s court proceedings in California.

E.  The Court Should Not Find That The Cost Of W.W.'s Hospitalization Constitutes Loss Within The Meaning Of Section 2B1.1[11]

First, the Defendant incorporates the above-referenced arguments and facts in support of his argument that it was W.W.'s conduct that caused his hospitalization.

More importantly, "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  §2B1.1.  Respectfully, the costs from W.W.'s hospitalization were not "reasonably foreseeable" to the Defendant.  It was not foreseeable to the Defendant that the California state court judge would remand W.W. to the Los Angelese County jail without bail. PSR ¶ 28.  And, while an experienced institutional actor might have known that a defendant like W.W. would go to an expensive state hospital for restoration purposes, a layperson like the Defendant would more reasonably have believed that someone like W.W. would go to an inexpensive outpatient facility to regain their competency.  See Exhibit M.  In addition, it was not foreseeable to the Defendant that W.W. would be evaluated for competency in the first instance.  Moreover, even if the Defendant's offense conduct was the cause of W.W.'s hospitalization, it was not the object of the Defendant's offense conduct to get W.W. locked up in a state hospital for competency restoration.

There is also the issue of whether the Defendant is responsible for the actions of the State of California.  The under-signed does not want to throw any State of California public defenders under the bus, but it is putting it kindly to write that the Los Angeles County District Attorney's Office was asleep at the wheel in not figuring out that W.W. was the "real W.W."  Section 1B1.3(a)(1)(B) does state that in the case of jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the criminal activity can count towards

---

[11] The Defense apologizes for bifurcating the loss argument, but this "loss" amount references facts cited after Section A to this Memorandum.

offense characteristics." *See also United States v. Mateos*, <u>131 S. Ct. 1540</u> (2011) (holding that a defendant may be held responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy). But, the State of California was not acting in furtherance of the Defendant's criminal activity, it was acting in furtherance of either its negligent prosecution of W.W. for identity theft, or it was acting in furtherance of its diligent prosecution of W.W. for grand theft. Either way, the cost of W.W.'s hospitalization at the behest of California institutional actors (who were not acting jointly with the Defendant in furtherance of his criminal activity) is not the responsibility of this Defendant.

The Government also noticed that it intends to argue the Defendant's credit cards (in W.W.'s name), in the amount of their credit limit, qualify as an intended loss. This argument fails for the reasons put forth in Section A of this brief; that the Defendant never intended to steal from the creditors and that he always intended to make good on his credit card debt.

More specifically, this is an impracticable method of calculating intended loss. The credit limit is a goalpost that moves with the cardholder's expenses, payments, and balances. The credit limit is only a fair marker for intent if the cardholder expenses an amount equal to it with no intention of paying it off. But more critically, because the Defendant always intended to pay off his balance (to avoid the creditor detecting his true identity) there never was any intended loss.

The Defendant repeats his respectful request that the Court sustain his objection and find there is no loss amount.

Alternatively, if the Court finds that the credit limit constitutes an intended loss, because the creditor is not out one penny and because the creditor was happy to be paid back the Defendant's expenses plus interest, the Defendant respectfully suggests that the Court depart downward because the offense level substantially overstates the seriousness of the offense. See

§2B1.1, comment. (n. 21(C)).

    F. The Court Should Not Apply A Two-level Enhancement Pursuant To Section 3A1.1(b)(1)

W.W.'s status as a vulnerable victim is at issue here. The PSR states W.W was a "homeless transient" and therefore more susceptible to identity theft. PSR, at p. 23.

Section 3A1.1 (to Chapter Three) provides that "if the defendant knew" the victim "of the offense was a vulnerable victim," the defendant receives a two -level increase. "Victim" is defined as anyone who is a victim "of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3," meaning "conduct that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." §3A1.1 comment. (n.2); see *also* USSG §1B1.3.

However, per Section 2B1.6, Chapter Three enhancements do not apply to violations of 18 U.S.C. § 1028A. See §2B1.6(a); *see also United States v. Telfort*, No. 18-CR-636 (WFK), 2021 WL 2550385 (E.D.N.Y. June 22, 2021). Note Three to §2B1.6 specifically provides "Do not apply Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) to any offense sentenced under this guideline. Such offenses are excluded from application of those chapters because the guideline sentence for each offense is determined only by the relevant statute." Id. at comment. (n.3).

So, while there are two counts here, "False Statement to a National Credit Union Administration Insured Institution" and "Aggravated Identity Theft", W.W. was victim to only the Aggravated Identity Theft. Because Chapter Three enhancements do not apply to Aggravated Identity Theft, and because W.W. was not a victim of the Defendant's false statement to a national credit union the Chapter Three vulnerable victim enhancement does not apply to the Defendant.

The only victims to the only offense, False Statement to a National Credit Union

Administration Insured Institution, that permits application of Chapter Three enhancements, are Dupaco Community Credit Union and Veridian Credit Union. Neither of these financial institutions are vulnerable.

Under the proper framework set forth by the Guidelines, the vulnerable victim enhancement does not apply to the Defendant because W.W. is not a victim to the Defendant's false statement to a credit union. Tellingly, in its response to the Defense's objection Probation wrote "In this case, as put forth above in the Offense Conduct section, the defendant knew that W.W. was a homeless transient, and as such, was more susceptible to *being the victim of identity theft* and detecting said offense." PSR, at p. 23 (emphasis added). It would be a stretch to find that W.W. was a victim to the Defendant's false statement to the credit unions.

It would also require a lot of squinting to find that W.W.'s victimization was part of the relevant conduct to the Defendant's false statements to the credit union. First, the Defendant was not physically present for and did not have control over California's treatment of W.W. W.W.'s incarceration was therefore not caused by the Defendant's conduct. Second, because the Defendant did not intend to defraud the credit unions, California's prosecution (which resulted from W.W.'s criminal doing) of W.W. was not in furtherance of his crime of false statements to the credit unions. But, even if the Defendant is responsible for California's treatment of W.W., any such conduct was in furtherance of the identity theft, not the false statements to the credit unions.

Should the Court determine that the Defendant is eligible to receive an enhancement under §3A1.1(b)(1), it is arguably debatable whether the Defendant knew or should have known that W.W. was vulnerable. While it may be inarguable that W.W. was in fact vulnerable, that is not the same thing as proving that the Defendant knew or should have known that W.W. was

vulnerable. Nothing in the record shows that the Defendant subscribed to Fousey's YouTube channel. Moreover, that the Defendant and W.W. were homeless together in 1988 does not mean that the Defendant should have known W.W. was homeless more than 30 years later. See PSR ¶ 8. To be sure, the Defendant was aware of W.W.'s incompetency, but the Defense respectfully submits that incompetency to stand trial does not equate to vulnerability under §3A1.1(b). See PSR ¶¶ 33 and 35. But even if it does, that does not mean that the Defendant, a layperson, should have known the significance of legal incompetency.

G. The Court Should Apply An Enhancement Under Section 3A1.3

Consistent with his plea agreement, Docket No. 27, at p. 15, the Defendant withdraws the instant objection and accepts the stipulation to an enhancement pursuant to Section 3A1.3. That written, and because the propriety of its application may inform the Court regarding other contested sentencing issues (application of §5K2.4 for example), the Defense offers the following thoughts.

Section 3A1.3 states that "if a victim was physically restrained in the course of the offense" to add two levels to the Base Offense Level. §3A1.3.

Multiple circuits state the "victim" contemplated by the physical restraint enhancement is not the victim of the offense of conviction but the "victim of [the] restraint." *See United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996); see *also United States v. Vought*, 69 F.3d 1498, 1502 (9th Cir. 1995); *see also United States v. Holbert*, 285 F.3d 1257, 1260 (10th Cir. 2002).

What constitutes "in the course of the offense," in the phrase "if a victim was physically restrained in the course of the offense" has been discussed among various circuits. The Sixth, Ninth, and Tenth Circuit have defined "in the course of the offense" to include conduct which occurred "during the commission of the offense of conviction, in the preparation for that offense,

or in the course of attempting to avoid detection or responsibility for that offense." *See United States v. Johnson*, 187 F.3d 1129, 1133 (9th Cir. 1999); *see also United States v. Cross*, 121 F.3d 234, 237 (6th Cir. 1997); s*ee also United States v. Holbert*, 285 F.3d 1257, 1260 (10th Cir. 2002) (defining "in the course of the offense" as all conduct relevant under §1B1.3).

According to §2B1.6, enhancements under "Chapter Three (Adjustments)" do not apply to violations of 18 U.S.C. § 1028A. §2B1.6.

W.W. was the restrained victim here. Of the two counts at issue, and as argued above, W.W. only a victim of Aggravated Identity Theft**.** Because Chapter Three enhancements do not apply to Aggravated Identity Theft, if W.W. is just a victim of the Aggravated Identity Theft, the enhancement does not apply. However, if (as multiple circuits have found) the "victim" contemplated is the victim of the restraint, rather than the victim of the offense, the question becomes whether a restraint which occurred during the Aggravated Identity Theft can still qualify for the enhancement under the False Statements to a National Credit Union Administration Insured Institution.

One could argue that the Defendant's contact with the California institutional actors was an attempt to keep W.W. incarcerated and institutionalized, and that the Defendant physically restrained W.W. "in the course of the offense" by restraining Woods to avoid the detection of his false statements to the financial institutions.

The Defendant disputes these arguments. He did not cause W.W.'s physical restraint. W.W.'s physical restraint resulted from his own criminal efforts and from his own mental health struggles; neither of which were caused by the Defendant.

In addition, the Defendant did not intend to defraud the credit unions, so W.W.'s restraint was not in furtherance of any effort to continue defrauding the credit unions. The Defendant

made false statements to get a loan. That's it. If any restraint resulted from conduct for which the Defendant is responsible, it was in furtherance of the Aggravated Identity Theft, not the False Statements to the credit unions.

To further assist the Court in determining how to rule on other disputed sentencing issues, the Defendant advises that "Physically restrained" is defined by Section 1B1.1, Application Note 1(L) as "the forcible restraint of the victim such as by being tied, bound, or locked up." USSG §1B1.1, comment (n. 1(L)). The Eighth Circuit has recognized that "such as" suggests the following words —"tied, bound, or locked up" — are illustrative, not limiting. *See United States v. Brings Plenty*, 335 F.3d 732, 735 (8th Cir. 2003). Therefore, physical restraint can be by actions other than tying, binding, or locking up.

Physical restraint does not require a "physical" component, such as touching or grabbing; still, case law suggests defendants must be physically present to restrain the victim.[12] *See United States v. Doubet*, 969 F.2d 341, 347 (7th Cir. 1992) (applying the previous Guideline for robbery-specific physical restraint and explaining that physical restraint only requires that the defendant create circumstances that permit no alternative to compliance).

For example, in *Brings Plenty*, the defendant entered the victim's home and restrained her by grabbing her ankle, pulling her off the bed, and holding her arms. *See Brings Plenty*, 335 F.3d at 735. In *Arcoren*, the defendant confined both victims to a room and refused to let them out, as well as placed a hand around the victim's throat, forcing her to lie on the bed. *See Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991). In *Wilson*, the defendant was a jail administrator who had inmates moved to a more dangerous cell where they would be assaulted by

---

[12] The case law on the issue of the "physical" component of the physical restraint enhancement is largely in robbery cases. Where a defendant wields a gun rather than touching the victims, that is still physical restraint, according to case law. *See United States v. Stevens, 58- F.3d* 718 (8th Cir. 2009); *see also United States v. Doubet*, 969 F.2d 341, 347 (7th Cir. 1992).

other inmates. *See United States v. Wilson*, 686 F.3d 868, 870-71 (8th Cir. 2012).

*Harris* provides an exception to the defendant's physical presence. There, the defendant was not physically present. *See United States v. Harris*, 959 F.2d 246, 264-65 (D.C. Cir. 1992). Instead, the defendant was engaged in a conspiracy, and his co-conspirators engaged in the conduct out of his presence. Where the actions in furtherance of the conspiracy were foreseeable, the defendant is responsible for that physical restraint, even if the defendant was not present. *See Id.*

In almost all the case law, the defendant has control over the physical restraint of the victims. In fact, courts have recognized that "restrain" means "to control." *See United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989); see *also United States v. Walker*, 74 F.4th 1163, 1196 (10th Cir. 2023) (stating that restraint means "the defendant's conduct must hold the victim back from some action, procedure, or course, prevent the victim from doing something, or otherwise keep the victim within bounds or under control").

In *Brings Plenty*, the defendant controlled the victim's movement by grabbing the victim. *See Brings Plenty*, 335 F.3d at 735. In *Wilson*, while the victims were lawfully incarcerated, the defendant, as the jail administrator, controlled where the inmates were placed and moved them to areas he knew they would be in danger as punishment. *See Wilson*, 686 F.3d at 872.

The Defendant was not physically present in Los Angeles where W.W. was imprisoned. This is a case where the Defendant's physical absence negates the control required under Section 3A1.3, such as when a defendant is engaged in a conspiracy and his co-conspirators engaged in the conduct. There was no conspiracy, and he was not a co-conspirator who could have foreseen the actions of his co-conspirators (there were no co-conspirators).

The Defendant did not have control of the jail or mental hospital which housed W.W. He

is not the clear agent of restraint here, using his physical body or a weapon to restrain W.W. Rather, law enforcement *lawfully* imprisoned W.W. The physical restraint of W.W. was too removed from the Defendant to constitute physical restraint under the enhancement. Law enforcement was not acting as an agent for the Defendant, as they did not follow his every order, and law enforcement was not his co-conspirator in a jointly taken criminal activity wherein the Defendant would share responsibility for their foreseeable actions.

This case is not the same as a defendant forcefully holding a victim down with his body or restraining a victim by confining them to a room. Even in cases where the defendant did not use their body to restrain the victim, like in *Wilson* – the jail administrator still had complete control over where the inmates were located.

Per the plea agreement, the Court should apply the Section 3A1.3 physical restraint enhancement, but the Defense respectfully requests that the Court consider the above when determining any other sentencing issues.

### H. The Court Should Not Impose A Fine and Should Sustain The Defendant's Objection To The Three Related Special Conditions of Supervision

In determining whether to impose a fine, courts shall consider, in addition to the factors set forth in section 3553(a), —

> (1) the defendant's income, earning capacity, and financial resources;
>
> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
>
> (3) any pecuniary loss inflicted upon others as a result of the offense;

31

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;

(7) whether the defendant can pass on to consumers or other persons the expense of the fine; and

(8) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.  18 U.S.C. § 3572.

The Defendant's monthly yearly income is his wife's monthly (during the school year) teacher salary plus her monthly seasonal salary from working at a grocery store.  PSR ¶ 109 and Exhibit N.  The total is approximately $39,000.  Id.  Because his wife's salaries alternate, it is improper to aggregate them.  The math should be closer to a monthly salary of $3,250 less monthly expenses of $2,464.  Id.  The difference is therefore closer to $750 than to $1,500.  The Defendant's monthly cash flow does not suggest an ability to pay a fine.

Complicating the Defendant's access to (and ability to liquidate) any assets is that he cannot very well sell any vehicles which are not property titled to him or his spouse.  Exhibit O.

The Defendant also notes that he will be subject to a restitution order in this case.  PSR ¶¶135-140.  The Defendant respectfully requests that the Court determine whether to impose a fine after it determines the amount of restitution.  See § 3572(a)(4).  Because the Defendant agrees to restitution of more than $6,000 the Defense respectfully requests that the Court find he is unable to pay a fine and sustain his objection to the related objected-to special conditions of

supervised release.

I.  The Defendant Objects To The Proposed Special Condition Requiring Participation In A Mental Health Evaluation

The Defendant respectfully denies that his history and characteristics support the objected-to special condition.  PSR ¶ 127.

J.  The Court Should Only Award $6,190 In Restitution

Initially, the Defendant submits that the record does not support awarding W.W. his requested $128,000.  See Docket No. 37-2.  As it happens, discovery materials actually demonstrate that W.W. has never had an account with Bank of America.  Exhibit P.

Respecting the $6,190, the Defendant agrees to pay this amount.  Exhibit Q.

K.  The Costs Of Court Appointed Counsel

The under-signed objects to any order requiring the Defendant to pay the costs of court-appointed counsel.   The Defense notes that while the vast majority of federal defendants are not able to shell out tens of thousands of dollars for private counsel, nor are they entirely destitute. Put differently, the vast majority of defendants are probably able to pay something toward the cost of their court-ordered representation.

The thoughts of the under-signed aside, this issue is governed by 18 U.S.C. § 3006A(f). A defendant has the burden of demonstrating that he is unable to afford counsel.  *See United States v. Anderson*, 567 F.2d 839, 840 (8th Cir. 1977).   Reimbursement is proper upon a finding that "funds are available."  *See United States v. Bracewell*, 569 F.2d 1194 (2d Cir. 1978); United *States v. Wetzel*, 488 F.2d 153 (8th Cir. 1973).

Generally, "cases in which a defendant's ineligibility for court appointed counsel has been affirmed are based upon the defendant's income and cash flow, not a requirement that the defendant sell his homestead to facilitate the payment of defense costs."  *United States v. Fincher*,

33

n.4 (8th Cir. 2008). Here, the Defendant's income and cash flow indicate that he is unable to pay for court-appointed counsel without selling his "homestead" or other assets.

However, if the Court determines that a reimbursement order is appropriate, the under-signed has attached a record of the hours he has worked on this case. Exhibit R.

L. The Court Should Not Depart Upward Under Sections 2B1.1, comment. (n.21); §3A1.3, comment. (n.3); §5K2.3 (Extreme Psychological Injury); §5K2.4 (Abduction or Unlawful Restraint); or §5K2.8 (Extreme Conduct)

i. Section 2B1.1, comment. (n.21)

Clearly Note 21(A)(vi) is most relevant here. It states that an upward departure may be appropriate in a case involving unlawfully obtained means of identification where:

(I)     The offense caused substantial harm to the victim's reputation, or the victim suffered a substantial inconvenience related to repairing the victim's reputation.

(II)    An individual whose means of identification the defendant used to obtain unlawful means of identification is erroneously arrested or denied a job because an arrest record has been made in that individual's name.

(III)   The defendant produced or obtained numerous means of identification with respect to one individual and essentially assumed that individual's identity.

To begin by knocking down some strawmen, Note 21(A)(vi)(I) clearly does not apply. This is because the offense did not cause substantial harm to the victim's reputation, and the victim did not suffer a substantial inconvenience related to repairing the victim's reputation. The Defendant's offense of living his best life under W.W.'s name did nothing to harm W.W.'s reputation. Consequently, there was nothing to repair. Nor was W.W. "erroneously arrested or

denied a job" (W.W. was properly arrested for attempted grand theft). See §2B1.1, comment. (n.21(A)(vi)(II)).

More problematic is Note 21(A)(vi)(III) which states that an upward departure may be warranted if the defendant produced or obtained numerous means of identification with respect to one individual and essentially assumed that individual's identity. This is, as a matter of fact, what happened here.

But, while the facts might fit, it is clear from subsections (I) and (II) to Note 21(A)(vi) that the Defendant's use of W.W.'s identity is not what the Commission contemplated in this Note. Consider *United States v. Hawes*, where the district court found that subsections (I), (II), and (III) all applied. The facts of that case are that:

> After stealing the personal checks of his roommates, Hawes fled to North Carolina, where he obtained a driver's license in Burke's name using the stolen birth certificate and Social Security card. While in North Carolina, Hawes incurred unpaid medical bills, credit card debt, telephone bills, and cable bills in Burke's name. Using Burke's identity, Hawes married a woman in North Carolina, fathered a child, and incurred child support obligations. Hawes subsequently abandoned this family and moved back to South Carolina, where he fathered another child, still using Burke's identity. When Hawes defaulted on his child support obligations in North Carolina, there was an attempt to garnish Burke's wages for the child support obligations incurred by Hawes using Burke's identity.
>
> Hawes used Burke's identity for more than a decade, and in the process, destroyed Burke's credit record.

Using Burke's identity, Hawes was convicted of at least three felonies and was incarcerated in state prison. Burke testified that he was once denied a job because of the criminal record that Hawes had compiled in his name. Burke further testified that he lost a job opportunity at another company which paid $20,000 more per year than his position at the time because the company's background check revealed the crimes that Hawes had committed using Burke's identity. *Id*. at 727-729.

Here, the Defendant did not do any of those things. Instead, the PSR reflects that in the last 25 years the Defendant has led a commendable life, albeit while under W.W.'s name.

And to belabor a point worth belaboring, W.W. was in the words of more than one[13] Los Angeles County prosecutor deserving of a conviction and punishment for trying to steal the Defendant's money.

Note 21(A)(vi)(III) is not intended for people like the Defendant who led a good life while using someone else's name. Nor is it intended for someone like the Defendant who wanted the man who tried to steal his money prosecuted.

    ii.  Section 3A1.3, comment. (n.3)

Note Three to Section 3A1.3 states: "If the restraint was sufficiently egregious, an upward departure may be warranted. See §5K2.4 (Abduction or Unlawful Restraint)." The restraint was not egregious. Any restraint in the Los Angeles County jail was de minimis in light of W.W.'s own criminal conduct that justified his arrest, prosecution, and incarceration. Any restraint in the

---

[13] The under-signed proffers that he spoke to one of W.W.'s state-appointed attorneys who informed the under-signed that before W.W.'s conviction became political and involved prosecutorial management that when they approached an assistant district attorney (ADA) about vacating W.W.'s convictions, the ADA responded that while W.W. could have his convictions vacated, he would need to plead to a theft charge in their stead.

hospital is also minimized by the reality that W.W. would have been evaluated for competency based on the delusions he expressed in open court. In addition, it is at least arguable that the "restraint" resulted in preferable conditions to W.W. living on the streets of Los Angeles; at least in jail and in the hospital, he was under the protection and care of law enforcement and medical professionals.

### iii. Section 5K2.3 (Extreme Psychological Injury)

Section 5K2.3 provides that an upward departure may be warranted if "If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked." Id.

Presumably, the basis for the departure is the psychic cost to W.W. from knowing that someone else used his name. It is unclear from the record at this time how the psychic cost from W.W.'s knowledge of the Defendant's conduct is "much more serious than that normally resulting from commission of" identity theft.

### iv. Section 5K2.4 (Abduction or Unlawful Restraint)

Section 5K2.4 provides that an upward departure may be warranted "If a person was abducted, taken hostage, or unlawfully restrained to facilitate commission of the offense or to facilitate the escape from the scene of the crime, the court may increase the sentence above the authorized guideline range." Id.

The Defense incorporates his arguments from Sections G and L(ii) in support of his opposition to this ground for an upward departure.

v. Section 5K2.8

This section does not apply. However aggravating the Defendant's conduct may have been, it does not rise to the level of *torture*, *gratuitous* infliction of injury, or *prolonging* of pain or humiliation. See §5K2.8.

## M. The Court Should Depart Downward Pursuant To Section 5K2.23; Alternatively, The Court Should Include The Time The Defendant Served In Bremer County Jail In Its Judgment

Records from Bremer County jail reflect that the Defendant served 112 days under case number FECR011142. Exhibit S; PSR ¶ 76. Because the conduct at PSR paragraph 76 qualifies under §5G1.3(b)[14], a downward departure in the amount of 112 days is appropriate under §5K2.23 which provides, in part, that a "downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of §5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment or Anticipated Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense." Id.

Alternatively, if the Court determines that Section 5K2.23 does not apply, the Defense respectfully requests that the Court include the dates from August 15, 2023, through December 5, 2023, in its judgment so that the Bureau of Prisons may properly calculate the Defendant's time credit. Exhibit S.

---

[14] Section 5G1.3(b) provides, in part, that "If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:
(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons."

38

N.  The Court Should Vary Downward

The Defendant lived an exemplary life from the mid-90s until 2019.  He worked. He raised a family.   He bettered his life.   It remains unclear why he could not have done all of this under his own name.   But, regardless of why he did not do those things under his own name, it ought to be abundantly apparent that he could have done all those things under his name.

He deserves credit for that.

The Defendant is also remorseful for his conduct.   He cannot change what he did to W.W. But, the least the Defendant can do is take make good on the restitution he owes him.   The Defendant has done that in full.   Exhibit T.

The Defendant also deserves imprisonment for assuming W.W.'s identity and then trying to keep using W.W.'s identity.   But, he does not deserve more than 54[15] months' imprisonment.

## IV. Conclusion

For the above reasons, the Defendant respectfully requests that the Court rule as argued above.

FEDERAL DEFENDER'S OFFICE
222 Third Avenue SE, Suite 290
Cedar Rapids, IA   52401-1509
TELEPHONE: (319) 363-9540
TELEFAX: (319) 363-9542

BY: /s/   Christopher J. Nathan
CHRISTOPHER J. NATHAN
christopher_nathan@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE
I hereby certify that on January 24, 2025, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

By:   /s/ Melissa Dullea

---

[15] This assumes that the Court finds either an advisory range higher than 54 months or that it departs beyond 54 months.

39