IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN (DUBUQUE) DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 23-CR-1020-CJW |
| vs. | ) | |
| MATTHEW DAVID KEIRANS, | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND MOTIONS FOR UPWARD DEPARTURE AND/OR VARIANCE**

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................. 2

II.  WITNESSES AND EXHIBITS ....................................................................... 2

    A.  Potential Witnesses ................................................................................. 2

    B.  Exhibits .................................................................................................... 3

III. FACTS .............................................................................................................. 4

IV.  ISSUES ............................................................................................................. 8

    A.  Sentencing Guidelines Issues ................................................................. 9

        1.  Loss ................................................................................................... 9

        2.  Substantial Financial Hardship .................................................... 11

        3.  Multiple Means of Identification ................................................. 12

        4.  Risk of Serious Bodily Injury ....................................................... 14

        5.  Vulnerable Victim .......................................................................... 14

        6.  Physical Restraint .......................................................................... 15

        7.  Sentencing Guidelines Calculation for Count 5 .......................... 15

    B. Financial and Supervision Issues ........................................................ 16

        1. Fine .................................................................................................. 16

        2. Mental Health Condition ............................................................... 16

        3. Restitution ...................................................................................... 17

        4. Repayment of Court-Appointed Counsel ................................. 17

    C. Motions for Upward Departure and/or Variance ........................... 17

V. CONCLUSION ................................................................................................ 20

## I. INTRODUCTION

On January 31, 2025, at 9 a.m., this Court will sentence defendant Matthew David Keirans upon his pleas of guilty to one count of False Statement to a National Credit Union Administration Insured Institution, in violation of 18 U.S.C. § 1014 (Count 5), and one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A (Count 7). By statute, defendant faces a sentence of between two and thirty-two years of imprisonment for these offenses, which involve a Kafkaesque plot that resulted in the false imprisonment, involuntary hospitalization, and forced medication of W.W., a homeless man in California. Given the extremely aggravating nature of the offense conduct in this case, the government requests an above-guidelines sentence of seventeen years of imprisonment and a fine of $250,000.

## II. WITNESSES AND EXHIBITS

    A. **Potential Witnesses**

        1. Special Agent Daniel Peczuh, Federal Bureau of Investigation

        2. Detective Ian Mallory, University of Iowa Police Department

B. **Exhibits**

1. California Department of Hospitals Bill

2. American Express Loan #1009

3. American Express Account #1006

4. American Express Account #1000

5. American Express Account #2003

6. U.S. Bank Account #4204

7. U.S. Bank Account #8653

8. U.S. Bank Account #9855

9. U.S. Bank Account #8100

10. Goldman Sachs Account #1669

10A. Goldman Sachs Attempted Account Openings and Increases

11A. DOSEofFOUSEY YouTube Video (Nov. 11, 2015)

11B. DOSEofFOUSEY YouTube Video (Nov. 12, 2015)

11C. DOSEofFOUSEY YouTube Video (Nov. 13, 2015)

11D. DOSEofFOUSEY YouTube Video (Nov. 14, 2015)

11E. DOSEofFOUSEY YouTube Video (Nov 15, 2015)

11F. MidoTV Adventure YouTube Video (Dec. 9, 2016)

## III. FACTS

The disturbing facts of this identity theft case read as if they are from a Kafka novel re-imagined for modern America,[1] but they are not in dispute:[2]

In approximately 1988, defendant and W.W. were homeless men working at a hotdog cart in Albuquerque, New Mexico. PSR ¶ 8. Soon thereafter, defendant assumed W.W.'s identity. *Id.* For the next three decades, defendant used W.W.'s identity in every aspect of his life. *Id.* ¶ 9.

Defendant obtained employment, insurance, a social security card, driver's licenses, titles, loans, and various forms of credit using W.W.'s identity. PSR ¶¶ 9, 17, 18. There is no record of defendant ever using his true name, date of birth, or social security number after 1988. *Id.* ¶ 9.

In 2013, while using W.W.'s identity, defendant began working at an Iowa City hospital as a high-level administrator in its information technology department. PSR ¶ 19. Defendant's access to, and role in, the system architecture of the hospital's computer infrastructure "was the highest it could be" and defendant "was the key administrator of critical systems." *Id.* By the time his employment at the hospital ended in 2023, defendant was earning a six-figure

---

[1] The famous Czech writer. *E.g.*, Franz Kafka, *Der Prozess* (1925), and the embedded parable, *Vor dem Gesetz* (1915).

[2] The stipulated facts are set forth at further length in Paragraphs 9(A) through 9(QQ) of the parties' plea agreement (R. Doc. 27). The offense conduct portion of defendant's Second Revised Final Presentence Report (R. Doc. 37, ¶¶ 6-57) is largely undisputed and is consistent with the factual stipulations in the plea agreement. The government does not repeat all those facts here.

salary in his high-level position. PSR ¶ 20. Defendant worked remotely from Hartland, Wisconsin. *Id.* ¶¶ 19, 26.

Between March 2014, and May 2022, and while employed by the Iowa City hospital under W.W.'s identity, defendant obtained nine personal and vehicle loans from two federally insured credit unions within the Northern District of Iowa. PSR ¶ 25. Specifically, defendant used W.W.'s name, social security number, and date of birth to obtain over $266,000 in loan proceeds. *Id.* Defendant admits he did so without lawful authority and in order to deceive and defraud. *Id.*

Meanwhile, W.W. remained homeless and transient. PSR ¶ 26. On August 20, 2019, W.W. entered a branch of a national bank in Los Angeles, California. *Id.* W.W. approached an assistant branch manager's window and told the assistant branch manager that he had recently discovered someone was using his credit and had accumulated large amounts of debt. *Id.* W.W. stated he did not want to pay the debt and wished to close his accounts at the bank. *Id.* W.W. explained an unknown individual had used his name and social security number, causing $130,000 in debt, and requested to know his full account numbers so he could close them. *Id.* W.W. provided the assistant branch manager with his true social security card, as well as an authentic State of California identification card. *Id.* W.W.'s name and social security number matched the name and social security number associated with the accounts at the bank. *Id.*

The assistant branch manager asked W.W. a series of security questions associated with the accounts, which W.W. was unable to answer correctly because

defendant had opened them using W.W.'s identity. PSR ¶ 27. The manager called the telephone number associated with the accounts, which was the defendant's number. *Id.* Defendant answered the call and the security questions correctly, and he stated no one in California should have access to his accounts. *Id.* The manager then called the Los Angeles Police Department ("LAPD"), which dispatched officers to investigate. *Id.*

Upon arrival, the officers spoke with defendant via telephone. PSR ¶ 28. Defendant repeated what he had told the manager and then faxed the officers a social security card, a Wisconsin driver's license, and a Kentucky birth certificate on the false pretense that defendant was the true W.W. *Id.* The officers arrested W.W. on a felony false impersonation charge, and a state court judge remanded W.W. to the Los Angeles County Jail without bail. *Id.*

Entirely as a result of defendant's actions—and in no small part due to a nearly compulsive persistence to ensure that his victim remain in chains—W.W. languished in some of the darker corners of the California criminal justice system for the next 575 days. PSR ¶ 37. During that time, defendant repeatedly made false statements to the LAPD, as well as the Los Angeles District Attorney's Office ("LADA"). *Id.* ¶¶ 29-35.

On August 21, 2019, defendant spoke with an LAPD officer and explained away an apparent inconsistency in the identification documents he had sent to the LAPD the prior day. Defendant then affirmatively stated to the officer "that he 'wishes to prosecute' the suspect that is 'using his identity.'" PSR ¶ 29.

On October 31, 2019, the LADA filed a two-count information against defendant, charging the felony crimes of identity theft and false impersonation. PSR ¶ 30. Each crime was punishable by no less than 16 months, and as much as three years, of incarceration in a county jail. *Id.* W.W. was charged in the name of defendant. *Id.*

On February 20, 2020, after W.W.'s state public defender doubted W.W.'s mental competency, a state court judge ordered W.W. to a publicly funded California mental hospital. PSR ¶ 31. The judge also ordered defendant to receive psychotropic medication. *Id.*

While W.W. was incarcerated and hospitalized, defendant contacted the LAPD and LADA "numerous times" requesting updates. PSR ¶¶ 32-35. Defendant falsely asserted defendant was the victim of identity theft. *Id.* Defendant demanded updates and "requested that the assistant district attorney 'represent my concerns' with the delay in the criminal proceedings." PSR ¶ 34.

In March 2021, after spending a total of 428 days in jail and 147 days in a mental hospital (and mostly during the worst days of the COVID-19 pandemic), defendant pled "no contest" to both felony charges in exchange for a time-served sentence and a $400 fine. PSR ¶ 36. In May 2021, the state court ordered W.W. "use only their true name, 'Matthew Kierans,'" and not to use "W.W." (which, of course, was his true name). *Id.*

Defendant continued to perpetrate his identity theft crime upon W.W. after his release. Defendant "repeatedly made false reports and statements to law enforcement officials in Wisconsin and California." PSR ¶¶ 38-46, 48.

Undeterred by the state court's order and the societal power imbalance between them, W.W. made numerous attempts to regain his identity from defendant. PSR ¶ 38. On January 13, 2023, upon learning defendant was employed in Iowa, W.W. contacted the Iowa City hospital's security department and stated defendant had stolen his identity. PSR ¶ 47. Fortunately, the hospital referred W.W.'s complaint to an experienced Iowa detective, who did not take W.W.'s situation at face value despite his homelessness, felony convictions, and mental health commitment. *Id.* By July 2023, the detective disproved defendant's lies and phony documents, unraveled defendant's three-decade identity theft scheme, and obtained his confession. PSR ¶¶ 47-52.

## IV. ISSUES

The United States Probation Office ("USPO") has identified twelve issues in the PSR. The first six issues concern the calculation of defendant's advisory guidelines range on Count 5, which the USPO calculates to be 27 to 33 months' imprisonment, based on a total offense level of 18 and a criminal history category I. PSR ¶ 113. In what follows, the government addresses the guidelines and other legal issues and then requests an upward departure and/or variance on Count 5.

A. **Sentencing Guidelines Issues**

1. **Loss**

For purposes of the guidelines, "loss" includes both actual loss and intended loss. USSG §2B1.1, Table Note "C." "'Actual loss'" means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* "Intended loss" includes "pecuniary harm the defendant purposely sought to inflict," even if impossible or unlikely to occur. *Id.* The Court need only estimate loss, which may include "[t]he fair market value of the property unlawfully taken." USSG §2B1.1, cmt (n3(B)).

Here, between March 2014, and May 2022, defendant used W.W.'s identity, including his name, social security number, and date of birth, to obtain nine vehicle and personal loans from two credit unions in the Northern District of Iowa. (PSR ¶ 25). The total money unlawfully taken was $266,929.30. (*Id.*) This is the actual and intended loss amount because it is the pecuniary harm the defendant purposely sought to inflict upon W.W. and the victim financial institutions.

The USPO recommends the Court subtract more than half of this loss amount under one of the guidelines' credit-against-loss provisions. USSG §2B1.1, cmt. (n.3). The USPO reasons that W.W. might not have learned of the offense until August 20, 2019, when defendant had W.W. arrested and jailed, and so only the portion of the loss incurred after that time, $112,135.25, should count as "loss" here.

Even if the USPO's credit-against-loss position analysis is correct, however, the Court's guidelines loss estimate should still exceed the $250,000 threshold and its attendant 12-level increase. Defendant's relevant conduct after August 20, 2020

9

includes opening various lines of credit totaling no less than an additional $144,500.00 using W.W.'s identity. PSR ¶¶ 17-18; Ex. 2-10; *see also* PSR ¶ 18 ("On various dates, the defendant obtained multiple credit cards from various financial institutions using [W.W.]'s identity, including credit cards . . .. .); PSR ¶ 17 (additional accounts).[3] For example:

Between August 21, 2019, and December 2021, defendant maintained and used a $23,000 line of credit ending in 8653 under W.W.'s identity at U.S. Bank. Ex. 7. Between December 2019, and January 2020, defendant maintained a $2,000 line of credit ending in 8100 at U.S. Bank. Ex. 9. In February 2021, defendant obtained a $29,000 line of credit ending in 1669 at Goldman Sachs. Ex. 10, at 1, 9.[4] In November 2022, defendant obtained a line of credit of at least $17,000 ending in 1000 at American Express. Ex. 4. In May 2023, defendant obtained a $25,000 business line of credit ending in 1005 at American Express. Ex. 5. Between December 2022, and January 2023, defendant maintained a $2,000 line of credit ending in 4204 at U.S. Bank. Ex. 6. In June 2023, defendant maintained a $16,500 line of credit ending in 9855 at U.S. Bank. Ex. 8. On July 4, 2023, defendant obtained a $15,000 personal loan ending in 1009 at American Express. Ex. 2, at 1.

---

[3] In addition to using W.W.'s personal identifiers, defendant falsely stated he was a "Sole Proprietor" in multiple "business" credit card applications. *See*, *e.g.*, Ex. 5, at 1; Ex. 3, at 1.

[4] Between April 2020, and July 2023, defendant repeatedly attempted to obtain lines of credit and credit limit increases from this same institution under W.W.'s identity. Ex. 10A. To avoid potential double counting, the government's loss figure does not include these attempts.

Defendant obtained the entire loan disbursement the same date. *Id.* at 3.[5] On July 6, 2023, defendant obtained a line of credit of at least $15,000 ending in 1006 at American Express. Ex. 3, at 1. Between July 7, 2023, and July 25, 2023, defendant incurred over $8,000 in expenses on this credit line. Ex. 3, at 2-5.[6]

Further, as a result of defendant's offense conduct, W.W. incurred $118,251.83 a statutorily mandated debt from the State of California for the costs of his involuntary hospitalization. Ex. 1; Cal. Welf. & Inst. Code §§ 7275, 7513.

Accordingly, the Court should apply a 12-level increase for loss, pursuant to USSG §2B1.1(b)(1)(G), because the loss in this case exceeds $250,000.

### 2. Substantial Financial Hardship

The Court should apply a two-level increase, pursuant to USSG §2B1.1(b)(2)(iii), because defendant's offense caused a substantial financial hardship to W.W. Defendant stole W.W.'s liberty for 575 days, completely depriving W.W. of the ability to earn an income during that period of time. PSR ¶ 36. Further, a California judge forbade W.W. from using his true name after his release. *Id.*[7] Although the government cannot find any reported cases with similar

---

[5] Defendant's family members repaid this loan between September 2023 and January 2024. Ex. 2, at 10.

[6] Among other things, defendant bought a credit report and a subscription to ChatGPT. Ex. 3, at 3.

[7] The factors in Application Note 4(F) to §2B1.1 are not exclusive. In any event, entirely depriving a man of his liberty causes a more severe financial hardship than the listed examples of "insolvency" or causing a victim to file for bankruptcy.

facts, defendant clearly caused W.W. a substantial financial hardship when he hijacked his identity and falsely imprisoned him.

### 3. Multiple Means of Identification

The Court should apply a two-level increase, pursuant to USSG §2B1.1(b)(11)(C), because defendant's offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification and, in any event, the possession of five or more means of identification that unlawfully were produced from or obtained by the use of, another means of identification. The USPO does not dispute that, facially at least, this provision applies; indeed, the undisputed facts show defendant obtained numerous means of identification in W.W.'s name in a multi-layered fashion over the years. Defendant obtained a fraudulent identification card in 1990 and parlayed that means of identification into many others. Exhibits 2 through 10 are but a small subset of account numbers defendant obtained by means of W.W.'s name and social security number and other identifying data. *See* USSG §2B1.1, cmt. 10(C)(ii) (stating account numbers obtained with an individual's name and social security number qualify as "the other means of identification").

The USPO declines to apply the multiple means of identification enhancement here, however, on account of Comment 2 to §2B1.6. The latter guideline, which governs defendant's conviction under 18 U.S.C. § 1028A in Count 7, states that the Court should "not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense."

The Court should not rely on Comment 2 to §2B1.6 here for two reasons. First, §2B1.6 is *ultra vires* and inconsistent with the plain language of 18 U.S.C. § 1028A. Section 1028A(b)(3) expressly states, "In determining any term of imprisonment to be imposed for the felony during which the means of identification was transferred, possessed, or used, a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section."[8] The Sentencing Commission's gloss on § 1028A in Comment 2 is unreasonable, and therefore invalid, insofar as it purports to instruct district courts to take into account the fact of the § 1028A conviction when determining an appropriate sentence for the underlying offense. *Mayo Found. v. United States*, 562 U.S. 44, 58 (2011); *see United States v. LaBonte*, 520 U.S. 751, 753 (1997) (invalidating Guidelines amendment where "the Commission's interpretation is inconsistent with [the statute's] plain language").

In any event, defendant did more than simply transfer, possess, or use means of identification. For example, defendant used Ancestry.com and W.W.'s name to cause the production of a false Kentucky birth certificate. PSR ¶¶ 15, 54. Accordingly, even if it were valid, §2B1.6 has no application here. *See, e.g., United States v. Jenkins-Watts*, 574 F.3d 950, 962 (8th Cir. 2009) (holding §2B1.6 did not

---

[8] The Supreme Court has distinguished § 1028A from § 924(c) in this regard. *See Dean v. United States*, 581 U.S.C. 62, 70-71 (2017) (observing that this portion of § 1028A, unlike § 924(c), is "a clear way to bar consideration of a mandatory minimum").

bar application of §2B1.1(b)(10), where the defendant produced counterfeit access devices).

### 4. Risk of Serious Bodily Injury

The Court should apply a two-level enhancement, pursuant to USSG §2B1.1(b)(16), because defendant's offense involved the conscious or reckless risk of serious bodily injury. Again, defendant caused W.W.'s false imprisonment and involuntary hospitalization during the height of the COVID-19 pandemic. W.W. forcibly received psychotropic medications after he would not admit he was "Matthew Kierans." PSR ¶ 31. Defendant consciously and recklessly caused a *risk* that defendant would suffer "extreme physical pain," would suffer "protracted impairment of a bodily member, organ, or mental faculty," or would require "medical intervention such as . . . hospitalization[] or physical rehabilitation."

### 5. Vulnerable Victim

The Court should apply a two-level enhancement, pursuant to USSG §3A1.1(b)(1), because defendant knew or should have known that W.W. was a vulnerable victim. The Guidelines define "vulnerable victim" to include anyone "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG §3A1.1, cmt. (n.2). Here, defendant was homeless and otherwise particularly susceptible to criminal conduct. *See, e.g., United States v. Rainford*, 110 F.4th 455, 486 (2d Cir. 2024) (affirming §3A1.1 enhancement because victims were homeless); *cf. United*

States v. Moskal*, 211 F.3d 1070, 1073 (8th Cir. 2000) (affirming, on other grounds, district court's reliance on homelessness under §3A1.1); Ex. 11A-11F.[9]

### 6. Physical Restraint

The Court should apply a two-level enhancement, pursuant to USSG §3A1.3, for physical restraint. Defendant stipulated in his plea agreement that this enhancement applies (R. Doc. 27, ¶ 12(C)), and the government understands defendant will withdraw his present objection to this enhancement.

### 7. Sentencing Guidelines Calculation for Count 5

The Court should calculate defendant's guidelines range for Count 5 as follows: Base Offense Level of 7, pursuant to USSG §2B1.1(a)(1); a 12-level increase for loss, pursuant to USSG §2B1.1(b)(1)(E); a two-level increase for substantial financial hardship, pursuant to USSG §2B1.1(b)(2)(A)(iii); a two-level increase for sophisticated means, pursuant to USSG §2B1.1(b)(10(C); a two-level increase for multiple means of identification, pursuant to USSG §2B1.1(b)(11); a two-level increase for risk of serious bodily injury, pursuant to USSG §2B1.1(b)(16); a two-level increase for vulnerable victim, pursuant to USSG §3A1.1.(B)(1); and a two-

---

[9] Exhibits 11A through 11F consist of publicly available YouTube videos (more particularly, "vlogs") from 2015 and 2016, which portray the circumstances in which two California vloggers happened to find W.W. during part of the offense conduct in this case. The government does not offer these exhibits for any particular statement or portion therein and certainly does not expect the Court to watch the hours of video in the exhibits. Rather, the government presents the Court with the exhibits in an attempt to provide a more general understanding of why W.W. was particularly susceptible to defendant's criminal conduct. A picture, or in this 21st Century instance, a vlog, is worth a thousand words. *See, e.g.*, Ex. 11A, at approx. 13:30-24:00; Ex. 11B, at approx. 13:00-28:00.

level increase for physical restraint, pursuant to USSG §3A1.3. With a three-level decrease for acceptance of responsibility under USSG §3E1.1, defendant's total offense level is 28. Because defendant is a criminal history category I, his resultant guidelines range for Count 5 is 78 to 97 months' imprisonment.

### B. Financial and Supervision Issues

#### 1. Fine

The Court should impose a fine and the associated standard financial conditions of supervision in this case. Defendant "bears the burden of proving both his inability to pay at the time of sentencing and that he is 'not likely to become able to pay a fine upon his release from his term of imprisonment.'" *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (citation omitted)). Defendant has not proven he does not have substantial assets and, in any event, it is clear he has a substantial capacity to earn money through employment. *See* PSR ¶¶ 19-20 (describing defendant's high-level position and six-figure salary). The government requests a fine at the top of defendant's guidelines range, *i.e.*, $250,000. USSG §5E1.2.

#### 2. Mental Health Condition

The USPO recommends the court impose a special condition of supervision requiring defendant to participate in a mental health evaluation and, if recommended, mental health treatment. Although defendant has reported no history of mental health concerns, PSR ¶ 96, he lived under another man's identity for more than three decades. In light of this highly unusual and longstanding behavior, a mental health evaluation involves no greater deprivation of liberty than

16
Case 2:23-cr-01020-CJW-MAR   Document 49   Filed 01/24/25   Page 16 of 20

is reasonably necessary under the totality of the circumstances. *Cf. United States v. Hicks*, No. 21-1732, 2022 WL 711546, at *2 (8th Cir. Mar. 10, 2022) (holding district court did not plainly err in imposing mental health condition partly due to "erratic and obstructive behavior over an extended period of time").

### 3. Restitution

The government anticipates requesting a restitution judgment against defendant, and in favor of W.W., in the amount of no less than $6,190 for lost wages. PSR ¶ 139. The government understands defendant will not dispute this restitution request. The government expects W.W. will offer an oral victim impact statement at the sentencing hearing and request additional restitution. *Id.*

### 4. Repayment of Court-Appointed Counsel

Pursuant to 18 U.S.C. § 3006A(c), the government requests the Court order defendant to reimburse the taxpayers for the attorney fees and costs associated with the federal public defender's representation. At the time of his arrest, defendant had substantial assets. The government has objected to defendant's recitation of his finances, in part because defendant omitted assets that he transferred to others following his arrest. PSR ¶ 109 & n.1; Ex. 2, at 10. By his own incomplete admission, however, defendant has over $180,000 in assets, including over $140,000 in liquid assets. PSR ¶ 134. Under these circumstances, the taxpaying public should not bear the costs of defendant's legal defense.

## C. Motions for Upward Departure and/or Variance

With respect to Count 5, the government requests upward departures to a 15-year sentence of imprisonment, pursuant to USSG §2B1.1, cmt. (n.21) (Loss

Understates the Offense); §3A1.3, cmt. (n.3) (Egregious Restraint), §5K2.3 (Extreme Psychological Injury), § 5K2.4 (Abduction or Unlawful Restraint), and/or §5K2.8 (Extreme Conduct). Alternatively, the government requests an upward variance to the same 15-year sentence on Count 5 after consideration of the factors at 18 U.S.C. § 3553.[10]

The Guidelines recognize there are some cases "so unusual that the case falls outside the heartland of cases covered by the Guidelines." *United States v. Bueno*, 443 F.3d 1017, 1023 (8th Cir. 2006). The case at bar is, most assuredly, such an unusual case. The undersigned can find no similar reported cases. The Guidelines as written do not fully capture the aggravation in defendant's offense conduct.

Note 21 to §2B1.1 recognizes an upward departure may be appropriate where "[t]he offense caused or risked substantial non-monetary harm." W.W. suffered substantial non-monetary harm in this case, and so the Court should depart upward under this guidelines provision.

Notwithstanding the fact that defendant received a two-level increase under §3A1.3 for physical restraint, Note 3 to §3A1.3 provides for an upward departure "[i]f the restraint was sufficiently egregious." Here, defendant did not just

---

[10] Defendant has indicated he will move for a downward departure, pursuant to USSG §2B1.1, cmt. (n. 21), on the theory that the loss amount substantially overstates the seriousness of his offense. In moving for an upward departure under this same guidelines note, the government necessarily resists a downward departure. The government anticipates filing a separate resistance to any motion for downward departure and/or variance that defendant files.

18
Case 2:23-cr-01020-CJW-MAR    Document 49    Filed 01/24/25    Page 18 of 20

physically restrain W.W., as might often trigger the guideline enhancement, but he caused W.W.'s incarceration and involuntary hospitalization for well over a year.

Section 5K2.3 provides for an upward departure if a victim "suffered psychological injury much more serious than that normally resulting from commission of the offense." Here, defendant caused defendant to be administered psychotropic drugs in a mental hospital for nearly five months.

Section 5K2.4 provides for an upward departure if a person was "unlawfully restrained to facilitate the commission of the offense." Again, defendant unlawfully restrained defendant for well over a year to facilitate the commission of the offense.

Section 5K2.8 provides for an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." Examples include "gratuitous infliction of injury" and "prolonging of pain and humiliation." Here, defendant not only instigated and monitored W.W.'s criminal case, but he continued to lie to California authorities in order to ensure W.W.'s continued suffering in a jail and mental institution.

In the event the Court does not depart upward under one or more of the foregoing guideline provisions, the Court should nonetheless vary upward and impose a 15-year sentence after consideration of the factors at 18 U.S.C. § 3553(a).

The government will explain its § 3553(a) analysis more fully at the sentencing hearing, with particular emphasis on the extremely aggravating nature and circumstances of defendant's offense conduct as set forth in Section III above. 18 U.S.C. § 3553(a)(1), (a)(2)(A). Defendant's offense conduct is especially

aggravating when judged against the mine-run violation of 18 U.S.C. § 1014, which penalizes a single, non-material false statement or report to a credit union concerning a loan. There is no credible evidence concerning the defendant's history and characteristics that appear mitigating; simply put, defendant's entire adult life was a lie. A significant sentence in this case is necessary to protect the public from further crimes of the defendant, to afford deterrence to criminal conduct, to promote respect for the law, and to provide a just punishment. 18 U.S.C § 3553(a)(2)(A)-(C). Finally, given the uniqueness of this case, a sentence above the Guidelines range will not result in unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6).

## V. CONCLUSION

The government requests that the Court grant its motions for upward departure and variance and sentence defendant to 15 years of imprisonment on Count 5 and a consecutive 2 years of imprisonment on Count 7.

Respectfully submitted,

TIMOTHY T. DUAX
United States Attorney

By: */s/ Timothy L. Vavricek*

TIMOTHY L. VAVRICEK
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, Iowa 52401-2101
319-363-6333
319-363-1990 – Fax
Tim.Vavricek@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2025, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: */s/ TLV*